NELSON McSTEA *v.* EDWARD MATTHEWS, IMPLEADED &c.

A state of war cannot exist between the United States and any foreign power, or between it and any portion of its own citizens, until a state of war has been recognized by the Congress of the United States.

The late rebellion of the Southern States was not such a state of war as to dissolve a copartnership between a resident of an insurrectionary and a resident of a loyal State, until the passage of the Act of Congress, July 13th, 1861, recognizing a state of war.

*Held,* therefore, in an action against a copartnership, composed of citizens of Louisiana and a citizen of New York, upon an acceptance made by the firm prior to the passage of the Act of July 13th, 1861, that the latter was liable, but he was not liable for obligations contracted in the firm name subsequent to the passage of that act.

Where in an action against a copartnership on an acceptance by it, a party is shown to have acted as a partner, and to have accepted the drafts in suit in the firm name, he is estopped from denying the copartnership.

APPEAL by the defendant Matthews from a judgment entered on the verdict of a jury at trial term.

The action was brought to recover the amount of two acceptances and a promissory note, alleged to have been made by the defendants as copartners under the firm name of Brander, Chambliss & Co.

The defendant Matthews interposed the defense that he was not a member of the firm at the time the acceptances were given and the promissory note was made, the firm, as alleged, having been previously dissolved.

It appeared on the trial that the defendant and appellant Matthews resided, at the time the acceptances and note were given, in New York, the other defendants being residents of New Orleans.

It also appeared that on the 27th day of March, 1861, the defendants Chambliss, Brander, Junior, and Matthews, acting for himself as well as the attorney in fact of James S. Brander, Senior, executed certain partnership articles, by which they agreed to form a limited partnership, which was to commence on the date of the copartnership agreement and continue until the 1st day of July, 1862, unless sooner dissolved, as provided. James S. Brander, Junior, Chambliss and Matthews were to be general partners, and James S. Brander, Senior, a special partner.

At the time of the execution of these articles of copartnership James S. Brander, Senior, was in the island of Nassau, and the partnership agreement provided that a copy thereof should be immediately transmitted to him for his approval, and in case of his refusal the agreement should become null and void.

A copy of the copartnership agreement was transmitted to him, and was received by him in May, 1861, and he at once refused to give his assent.

In the meantime the firm of Brander, Chambliss & Co. went on with the proposed business, the defendant Matthews taking an active part in its management.

On the 23d day of April, 1861, at New Orleans, a draft was drawn bearing that date, for $8,050 6-100 on Brander, Chambliss & Co., and accepted by them.

The testimony was conflicting whether that draft was ac-

cepted in the name of the firm by James S. Brander, Junior, or by the defendant Matthews.

On the 26th day of April, 1861, the defendant Matthews, acting for the firm of Brander, Chambliss & Co., executed a power of attorney appointing one Burke the attorney in fact of the said firm.

Prior to April 23d, 1861, the State of Louisiana had seceded from the United States. On the 15th of April and 19th of April, 1861, the President by his proclamation declared that the insurrection existed, and that the ports of Louisiana, with those of other Southern States, were under blockade.

On the 13th day of July, 1861, an Act of Congress was passed, authorizing the President to issue a proclamation declaring the inhabitants of any State where insurrection existed in a state of insurrection against the United States, and the Act declared that thereupon " all commercial intercourse " by and between the same and the citizens " thereof and the citizens of the rest of the United States " shall cease and be unlawful so " long as such condition of hostilities shall continue," and on the 16th of August, 1861, the President issued his proclamation declaring Louisiana with other States in a state of insurrection against the United States, and forbidding all commercial intercourse with the inhabitants of such States.

In October, 1861, Brander & Chambliss published a notice of the dissolution of the firm of Brander, Chambliss & Co., and of the withdrawal of the defendant Matthews therefrom.

On the 26th day of February, 1862, at New Orleans, a draft was drawn bearing that date on Brander, Chambliss, & Co. for $1,169 99 and accepted by them "per G. Burke, atty.," and on the same day another draft was drawn for $107 97 and accepted in the same way, and on the 2d day of January, 1862, the firm, " per G. Burke," gave their promissory note for $864 25. This action was brought upon the three drafts and promissory note.

The jury were instructed to find a verdict for the plaintiff for the full amount claimed, and from the judgment entered upon this verdict Matthews appealed.

*John Sherwood*, for appellant.

I. The copartnership agreement was rendered absolutely void by the disapproval of Mr. Brander, Sr. But if any copartnership ever existed, it was dissolved by Brander & Chambliss on the 21st of October, 1861, by the publication of a notice of dissolution of the firm by the members in New Orleans.

II. If any copartnership existed, it was dissolved as to the defendant Matthews, a resident of New York, by the war of the rebellion, and he cannot be held liable upon any contracts of the firm made after the war began. The State of Louisiana had seceded from the United States prior to April 23d, 1861. The proclamations of President Lincoln of April 15th and April 19th, 1861, declared that the insurrection existed and the ports of Louisiana (among those of other States) to be under blockade.

The President, by authority of the act of Congress (July 13th, 1861,) did, by proclamation of 16th of August, 1861, declare Louisiana and other States in a state of insurrection against the United States and forbode all commercial intercourse with the inhabitants of such States.

The state of war existed without any formal declaration. All the people of each State in insurrection against the United States must be regarded as enemies. (*The Venice*, 2 Wallace, 274; *Mrs. Alexander's Cotton*, 2 *Id.* 404.)

Partnership as to enemies is impossible. The existence of a state of hostilities between the countries renders illegal all commercial intercourse between their citizens. (*Griswold* v. *Waddington*, 15 Johns. 57 ; 16 *Ib.* 438 ; *The Rapid*, 8 Cranch, 155 ; *Scholefield* v. *Eichelberger*, 7 Peters, 585.) Notice of the dissolution is unnecessary, for war itself is notice. (*Case of the William Bagally*, 5 Wallace, 507 ; *Hanger* v. *Abbott*, 6 *Id.* 535 ; *Swinnerton* v. *The Columbia Ins. Co.*, 37 N. Y. 178 ; *Sanderson* v. *Morgan*, 39 N. Y. 231 ; *Allen* v. *Russel*, 12 Amer. Law Reg. 302 ; *Billgerry* v. *Branch*, 17 *Ib.* 33 ; *Coppell* v. *Hall*, 7 Wallace, 555.)

III. This action was commenced March 4th, 1864, and the plaintiff is and was a resident of Louisiana, and during the

existence of the war had no status in the courts of this State. There is no proof of his having taken the oath of allegiance. (*Sanderson* v. *Morgan*, 39 N. Y. 231.)

IV. All contracts between citizens of the different States being absolutely void, after April 15th, 1861, the defendant is not estopped by his acts, such as letters written by him after that date, from setting up the defense of dissolution of copartnership. The defense is allowed not for the sake of a defendant, but for the law itself. (*Griswold* v. *Waddington*, 16 Johns. 484; *Coppell* v. *Hall*, 7 Wallace, 558.)

V. The plaintiff cannot recover interest. (*Jackson Ins. Co.* v. *Stewart*, U. S. Cir. for Maryland, Amer. Law Reg., N. S. Vol. 6, 732; *Tucker* v. *Watson*, *ib.* 220, 2 Nott & McCord, 498; *Wall* v. *Robson*, 2 Nott & McCord, 258, 2 Cranch, 272, 3 *Ib.* 54 (J. Washington), Peters C. C. R. 496.)

*Martin & Smith* and *Augustus F. Smith*, for respondents.

I. The evidence that Matthews was a partner was complete without any reference to the articles of agreement or the private stipulations of the parties. (2 Greenleaf's Ev. § 479; Collyer on Part. § 770.)

II. No such state of war existed on April 26th, 1861, as could affect the validity of the notes. A war to be a war must be declared or recognized by Congress. (Constitution U. S, Art, 1, § 8, sub § 10.) A state of actual hostilities is not conclusive. (1 Kent, Com. 55 and 61, note *b ;* Lawrence's Wheaton, 505.) The rebellion is called an *insurrection* as late as the Act of Congress of July 12th, 1861.

By the Court *—Van Brunt, J. The defendant Matthews claims that no recovery can be had against him in this action, first, because he was not at the time of the acceptance of the drafts, and the making of the promissory notes in suit, a member of the firm of Brander, Chambliss & Co., and second, because, if the partnership had been formed, it had been dissolved

---

* Present—Loew and Van Brunt, JJ.

(1) by the war of the rebellion; (2) by the refusal of Brander, Senior, to sanction the formation of the firm; (3) by the proclamation of Aug. 16th, 1861; (4) by the act of the parties and the notice of dissolution in October, 1861.

The fact that Matthews was a member of the firm of Brander, Chambliss & Co. would seem to be sufficiently established by the admissions of Matthews himself, contained in the power of attorney to Burke, dated April 26th, 1861, wherein he describes himself as a member of that firm. There is no pretense that if that firm was ever formed, it was done at any other time than when the written articles of copartnership were signed on the 27th of March, 1861. In fact, the witness Burke testifies that Matthews took an active part in the formation of the partnership and in the management of the business afterwards, and that during the time that he remained in New Orleans, after its formation, he daily attended to its business, and that after he arrived in New York he wrote letters frequently in relation to the business of the firm. Burke further testifies that the firm went on in their business without waiting for the assent of James S. Brander, Senior. The draft of April 23d, 1861, was accepted under the personal supervision of Matthews. It would thus seem to be clear that the defendant Matthews was a member of the firm on the 23d of April, 1861, unless the firm had been dissolved by the rebellion. This brings us to the consideration of the more difficult point in the case, what effect did the rebellion have upon agreements of this nature where the contracting parties resided in different sections. Are they dissolved by it, and if so, when? I need not attempt to show that the breaking out of a war between two countries dissolves by the mere force and effect of war itself all existing partnerships between citizens or subjects of the two countries. (*Griswold v. Waddington*, 16 John, 438.) This principle has been so long settled that it is not now open for discussion.

In the case of the commencement of hostilities between two countries there is no difficulty in determining when a war began, and that is especially so as respects the United States of America, because the right of making war is lodged by our Constitution in Congress, and before it can exist, it must be re-

cognized or declared by the war-making power of the government. But in the case of a rebellion, civil war or insurrection, at first it might seem impossible to fix a general rule which would serve as a clear and safe guide to all persons who may have been engaged in commercial ventures in the district in which the rebellion or insurrection has arisen.

And this difficulty arises from determining when the insurrection attains the dignity of war.

Mr. Justice Nelson in his dissenting opinion in the *Prize cases* (2 Black, 635), has so ably and logically treated this subject that it only seems necessary to quote from that opinion in order to show what rule should govern the case now under consideration. He says " In the case of a rebellion or resistance of a portion of the people of a country against the established government, there is no doubt if in its progress and enlargement the government thus sought to be overthrown sees fit, it may by the competent power recognize or declare the existence of a state of civil war, which will draw after it all the consequences and rights of war between the contending parties, as in the case of a public war."

" Mr. Wheaton observes, speaking of civil war, 'But the general usage of nations regards such a war as entitling both the contending parties to all the rights of war as against each other and even as respects neutral nations.' But before an insurrection against the established government can be dealt with on the footing of a civil war within the meaning of the law of nations and the constitution of the United States, and which will draw after it belligerent rights, it must be recognized or declared by the war making power of the government. No power short of this can change the legal status of the Government or the relations of its citizens from that of peace to a state of war or bring into existence all those duties and obligations of neutral third parties growing out of a state of war. The war making power of the Government must be exercised before the changed condition of the Government and people and of neutral third parties can be admitted. There is no difference in this respect between a civil or public war."

After discussing at considerable length the provisions made

by the constitution and acts of Congress for the suppression of insurrection, the learned judge continues : "The war carried on by the President against the insurrectionary districts in the Southern States, as in the case of the King of Great Britain in the American Revolution, was a personal war against those in rebellion, and with encouragement and support of loyal citizens, with a view to their co-operation and aid in suppressing the insurgents, with this difference, as the war making power belonged to the King, he might have recognized or declared the war at the beginning to be a civil war, which would draw af-ter it all due rights of a belligerent; but in the case of the President no such power existed : the war, therefore, from necessity, was a personal war, until Congress assembled and acted upon this state of things.

"Down to this period the only enemy recognized by the Government was the persons engaged in the rebellion, all others were peaceful citizens, entitled to all the privileges of citizens under the constitution. Certainly it cannot rightfully be said that the President has the power to convert a loyal citizen into a belligerent enemy or confiscate his property as enemy's property."

On the 13th of July, 1861, Congress having been assembled on the call for an extra session, passed an act authorizing the President by proclamation to interdict all trade and intercourse between all the inhabitants of States in insurrection and the rest of the United States. In pursuance of the authority conferred upon him by that act, the President issued his proclamation on the 16th of August, 1861, embracing Louisiana and the other States in rebellion.

Mr. Justice Nelson observes that "This act of Congress recognized a state of civil war between the government and the confederate States, and made it territorial. The act of Parliament of 1776 which converted the rebellion of the colonies into a civil territorial war, resembles, in its leading features, the act to which we have referred. Government in recognizing or de-claring the existence of a civil war between itself and a portion of the people in insurrection usually modifies its effects with a view, as far as practicable, to favor the innocent and loyal citizens or subjects involved in the war."

From the foregoing it must inevitably follow that a state of war cannot exist between the United States and a foreign government or the United States and a portion of its own citizens, until a state of war is recognized by the war making power, which by our constitution is lodged in the Congress of the United States. It would thus appear that war under our system of government can exist only by act of Congress, which requires the action of two of the great departments of the government, the Executive and Legislative.

The insurrection in the Southern States did not therefore, before the passage of the act of Congress of July 13, 1861, attain to the dignity of war. This not only follows from our system of government, but the rule thus established commends itself to our good judgment as establishing a fixed and certain point of time, when every man may know when his engagements with the residents of the districts in insurrection are dissolved by the mere force of the insurrection or war itself.

If any other rule is adopted, every person who may be engaged in business in that portion of the country in insurrection or who may have commercial relations with the residents of such districts, would be entirely at a loss to determine when commercial intercourse with the residents of the insurrectionary district became unlawful and when his engagements with such residents had become suspended by reason of such insurrection. He would be left to grope his way in the dark, without any guide whatever to aid him. It is not the policy of the law to adopt a rule which involves uncertainty when preciseness can be as easily attained. The justice of the rule laid down by Mr. Justice Nelson commends itself to us, not only because it is most in accordance with the theory of our government, but also because it is the one which will enable every man to act with certain knowledge as to the effects of his acts, and to ascertain when his commercial intercourse with the people in insurrection is illegal.

Applying these principles to the case now under consideration, it will be seen that the defendant Matthews is liable as a member of the firm of Brander, Chambliss and Co., upon the draft for $8,050.06 dated New Orleans, April 23d, 1861, but

that this firm being dissolved by the recognition by Congress of the existence of a state of war between the United States and the State of Louisiana and other Southern States, he is not liable upon the other drafts and the note mentioned in the complaint. The judgment must be reversed with costs to abide the event unless the plaintiff stipulates to reduce his judgment to the amount of the first draft, in which case judgment is affirmed.

Judgment accordingly.